## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No.  09-10007-01-MLB |
| | ) | |
| JOSE ROMEO CAZARES, | ) | |
| a.k.a. Sergio Castro, | ) | |
| | ) | |
| Defendant. | ) | |

_____

### MEMORANDUM AND ORDER

This case comes before the court on defendant's motion to suppress. (Doc. 20). The motions are fully briefed and the court conducted an evidentiary hearing on May 11, 2009. (Docs. 25, 26). The motion to suppress is DENIED for the reasons herein.

## I. FACTS[1]

On January 27, 2009, at approximately 4:00 p.m., Kansas Highway Patrol Trooper Doug Carr was patrolling Interstate 70 near Quinter, Kansas in Gove County.  Carr's Supervisor, Lt. Greg Jirak, called and told him to be on the lookout for a green car with tinted windows and Arizona tags that was driven by either a Hispanic or Caucasian driver. Lt. Jirak told Carr that the driver refused to or did not look at

---

[1]The facts consist of testimony by Trooper Carr.  The court credits the testimony of Carr, the only witness pertaining to the initial stop, detention, and consent to search.  Defendant declined the opportunity to testify.

him[2], which was suspicious.[3]   At this point in time, Lt. Jirak was in Thomas County about 50 miles west of Carr's location.   Carr continued patrolling and kept an eye out for this suspicious vehicle.

Approximately 45 minutes later, Carr was parked in the median near mile marker 106 when he thought he saw the green car drive past him going eastbound.   Carr, who was headed westbound, got off I-70 at the nearest exit and got back on going eastbound.   Carr sped up and eventually caught up with the green car around mile marker 113 or 114 in Trego County.   While coming up behind, Carr identified the green car as a Volkswagen Passat with Arizona tags.   He observed the driver, who was later identified to be defendant Jose Romeo Cazares, cross the fog line approximately one or two feet and then weave back into the driving lane.   Shortly thereafter, defendant crossed the center line with both driver's side tires, wove back, and eventually crossed the fog line a second time.   Carr noted that there was no real wind and the road was straight and level.   No other cars appeared to have trouble maintaining a single lane of traffic.   Carr moved into the passing lane and pulled up far enough to see if defendant had on his seatbelt, which he did.   Carr dropped back behind the Volkswagen and activated his emergency lights, which also turned on Carr's video equipment in his patrol car.[4]   The Volkswagen pulled over to the

---

[2]Carr did not know how long Lt. Jirak was driving along side the green car when its driver would not look at him.

[3]Carr testified that very few drivers refuse to look at him.

[4]Carr's video system was not activated at the time Carr alleges Defendant was weaving because he had not turned on his emergency lights.   Carr testified that he never turns on his video equipment manually.

-2-

shoulder at mile marker 115 and Carr pulled up behind him at approximately 5:00 p.m.

Carr stepped out of his patrol car and walked up to the Volkswagen. Carr manually turned on his microphone. He checked for weapons starting at the back of the car. In the back seat, Carr saw one small suitcase and noticed a club to lock the steering wheel lying on the floorboard. Carr thought the club was odd because you do not see that often anymore. Carr walked over to defendant and smelled a heavy new car odor and saw a Bible written in Spanish.

Carr asked defendant for his driver's license and proof of insurance. Defendant handed Carr an Arizona driver's license issued to Sergio Castro. Right away Carr could tell that defendant was tired. Defendant's eyes were glazed, a little bloodshot, and droopy, which Carr testified are signs of intoxication or fatigue. Carr asked defendant if he was tired. Carr also told him he failed to maintain a single lane of traffic. Defendant admitted that he was little tired, but denied making the lane violations.

Carr was concerned that defendant was intoxicated or fatigued. Carr gave defendant back his proof of insurance and asked defendant to step out of the Volkswagen and come sit inside his patrol car.[5] It was very cold outside and Carr could not smell any odors besides the new car smell. Defendant followed Carr to his patrol car and sat down in the passenger seat, but was not locked inside.

While Carr was verifying defendant's license, he asked defendant how he was feeling. Defendant responded that he had been driving for

---

[5]Carr testified that he frequently has drivers come sit inside his patrol car because it is both warmer and safer.

-3-

about six hours. Carr performed the Horizontal Gaze Nystagmus ("HGN") field test on defendant, which defendant passed. Carr asked defendant where he was traveling. Defendant stated that he was coming from Tucsan, Arizona to Minneapolis, Minnesota to visit his ex-wife. He was going to try and convince his ex-wife to come back to Tucsan. Based on his experience, Carr was suspicious about defendant's response because normally, people do not drive cross country to convince an ex-spouse to come back. Additionally, Carr testified that Tucsan is a "source city" and Minneapolis is a "destination city" for drugs.

At this point, Carr's dispatcher returned and informed Carr that defendant's tag and driver's license were valid. However, defendant had an outstanding non-extraditable warrant in California.[6] Carr asked defendant about warrant. Defendant denied ever being arrested in California.

Carr gave defendant back his driver's license and issued him a warning for failing to maintain a single lane of traffic. Carr handed defendant the warning and made sure defendant had everything back. Defendant had a question about the warning and Carr explained it. Carr said to have a safe trip. Defendant said thank you and shook Carr's hand. Defendant opened door of Carr's patrol car and started to get out. As defendant was opening the car door, Carr asked if he could ask defendant a question before he left. Defendant nodded his head yes and sat back down in the passenger seat.

Carr asked again about defendant's travel plans because they did

_____

[6]A state will not send authorities to pick up a person with a non-extraditable warrant who is stopped in another state.

not make sense.   Carr also questioned defendant again about the
California warrant and further asked defendant if he had ever been
arrested.   Defendant answered no.   Carr then said "your not carrying
anything illegal?   Nothing illegal in your car?   Do you mind if I
check?"   Defendant answered that he did not have anything illegal in
the Volkswagen and consented to Carr's search.   Carr told defendant
that he could either stay in the patrol car or wait outside while he
searched.   At no time did Carr tell defendant that he had a right to
refuse consent.

Carr patted defendant down for weapons and having found none,
proceeded to walk over and search the Volkswagen.   Carr started with
the driver's side front seat and saw two cell phones.   Carr's
dispatcher then called and asked him to call on his cell phone.   Carr
walked back to his patrol car.   While making the call to his
dispatcher, Carr asked defendant if both cell phones were registered
to him.   Carr testified that defendant appeared very nervous[7] and
would not give a direct answer.   Carr finished his phone call and
asked, "say is it alright if I keep looking?"   Defendant said yes.

Carr continued to search the Volkswagen.   At some point, Lt.
Jirak arrived and helped search.   Carr and Lt. Jirak noticed that the
roof of the car was lower than it should be.   They pounded on the roof
and felt that it went from hollow to solid to hollow again.   There was
an unexplainable void in the roof with something inside.   Carr and Lt.

---

[7]Carr testified that defendant was extremely nervous.
Defendant's hands would shake at times when he answered questions.
Defendant would look down and away instead of making eye contact.
When he would look at Carr, his lip would quiver.   Defendant also had
"cotton mouth" and asked at least twice for water.

-5-

Jirak tried to open the Volkswagen's hatchback, but could not get it open. The troopers walked back to defendant and told him that there was something solid inside there. They explained that they were trying to open the hatchback to search the roof, but could not get it open. Defendant told them how to raise the hatchback.

Carr and Lt. Jirak opened the hatchback and saw two screws in the roof. The screws were on the outside holding up the fabric. They took the screws out and saw that the back part of the roof was held together by double-sided sticky tape. Underneath the fabric was stiff cardboard, which the troopers pulled down. Carr and Lt. Jirak looked through the void and saw a grey package. The troopers eventually found 25 kilos of cocaine inside the void in the roof.

Defendant was then placed in Lt. Jirak's car. Carr and Lt. Jirak finished searching the roof. They took pictures of defendant next to the Volkswagen and cocaine. The troopers put defendant back into Lt. Jirak's patrol car and Mirandized him at that point. Carr took defendant and the Volkswagen to the Kansas Highway Patrol office in Wakeeney, Kansas and unloaded the cocaine.

## II.  Analysis

The court is aware of the standards applicable to matters of this nature. In <u>United States v. Quintana-Garcia</u>, 343 F.3d 1266 (10th Cir. 2003), the court stated:

> "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." <u>United States v. Arvizu</u>, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and <u>United States v. Cortez</u>, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). The

requirements of the Fourth Amendment are satisfied in this context "if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'" <u>Id.</u> (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting <u>Terry</u>, 392 U.S. at 30, 88 S. Ct. 1868)).

The Supreme Court has emphasized that, in determining whether an investigatory stop is supported by reasonable suspicion, courts must "'look at the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>Id.</u> The evaluation is made from the perspective of the reasonable officer, not the reasonable person. Officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" <u>Id.</u> (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)); <u>see also</u> <u>Gandara-Salinas</u>, 327 F.3d at 1130.

<u>Id.</u> at 1270.

The standards also were discussed in <u>United States v. Johnson</u>, 364 F.3d 1185 (10th Cir. 2004), as follows:

<u>Terry</u> sets up a two-prong test of the reasonableness of investigatory detentions and weapons searches. <u>See</u> <u>Gallegos v. City of Colorado Springs</u>, 114 F.3d 1024, 1028 (10th Cir. 1997). First, we must decide whether the detention was "'justified at its inception.'" <u>Id.</u> (quoting <u>Terry</u>, 392 U.S. at 20, 88 S. Ct. 1868). The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." <u>Terry</u>, 392 U.S. at 21, 88 S. Ct. 1868. Those facts must tend to show that the detainee has committed or is about to commit a crime. <u>Gallegos</u>, 114 F.3d at 1028 (citing <u>Florida v. Royer</u>, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). Second, the officer's actions must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" <u>United States v. Shareef</u>, 100 F.3d 1491, 1500 (10th Cir. 1996) (quoting <u>Terry</u>, 392 U.S. at 20, 88 S. Ct. 1868). At both stages, the reasonableness of the officer's suspicions is "judged by an objective standard taking the totality of the circumstances and information available to the officers into account." <u>United States v. Lang</u>, 81 F.3d 955, 965 (10th Cir. 1996).

<u>Johnson</u>, 364 F.3d at 1189.

**A.  Initial stop**

The government argues that Carr's decision to stop defendant was reasonable because the Volkswagen crossed the fog line twice and the center line once.  Defendant claims that he did not cross the fog and center lines.  He further claims that Carr stopped him because he is Hispanic and was driving a vehicle with Arizona license plates.  Carr testified that Lt. Jirak told him that the driver to be on the lookout for was either Hispanic or Caucasian.  Carr further testified that he did not know that defendant was Hispanic until he spoke with him.[8] Defendant presented no evidence at the hearing to rebut Carr's testimony.  Defendant's failure to support his claims with evidence does not shift the burden of proof.  Rather, "... it simply allows the persuasive force of the Government's evidence to go undiminished." United States v. Conley, 131 F.3d 1387, 1391 n. 2 (10th Cir. 1997).

The court finds that Carr was justified in stopping defendant's car in the first instance.  The court accepts Carr's testimony that he observed defendant commit a traffic violation under state law.  See K.S.A. 8-1522(a) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").  Carr's subjective reasons, if any, are irrelevant because it was reasonable to stop defendant for failing to maintain a single lane of traffic.  See United States v. Tibbetts, 396 F.3d 1132, 1137 (10th Cir. 2005) (stating that as long as the officer has a reasonable articulated suspicion, the officer's subjective motives

---

[8]Defendant spoke English with an accent.

-8-

for stopping the vehicle are irrelevant).

**B. Justified detention**

Even when the initial stop is valid, any investigative detention must not last "longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).

The uncontroverted testimony shows that Carr approached defendant's car upon initially stopping him and asked for defendant's driver's license and proof of insurance. Carr immediately noticed that defendant's eyes were glazed and a little bloodshot. Carr asked defendant if he was tired and defendant admitted that he was. Due to the cold and his concern that defendant might be intoxicated or fatigued, Carr asked defendant to accompany him to his patrol car so he could check both defendant's driver's license and physical well-being. Carr verified defendant's driver's license and performed the HGN test while defendant sat in his patrol car. Carr issued defendant a warning and answered defendant's question regarding the warning.

The court finds that Carr's actions were appropriate. The initial stop and detention lasted approximately 30 minutes. Carr did not detain defendant longer than reasonably necessary to ascertain whether defendant was intoxicated or fatigued. Carr asked about defendant's travel plans and outstanding warrant while verifying defendant's driver's license. See United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007) (holding that an officer may ask questions unrelated to the initial purpose for the stop as long as it

does not unreasonably delay the driver).  Therefore, the scope of the traffic stop was reasonably related in scope to the circumstances that initially justified the interference.[9]  <u>Terry</u>, 392 U.S. at 20.

### C. Consent to search

"[F]urther detention for purposes of questioning unrelated to the initial stop" is generally impermissible.  <u>Bradford</u>, 423 F.3d at 1156-57.  Nevertheless, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances.  First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter."  <u>United States v. Hunnicutt</u>, 135 F.3d 1345, 1349 (10th Cir. 1998).  The return of the driver's documents alone does not "transform a detention into a consensual encounter if the totality of the circumstances gives the driver an objectively reasonable basis to believe he is not free to go. [Citations omitted].  Such a reasonable belief may be supported by the presence of more than one officer, the display of a weapon, the physical touching of the detainee, the officer's use of a commanding tone of voice, and the officer's use of intimidating body language. <u>United States v. Chavira</u>, 467 F.3d 1286, 1290-91 (10th Cir. 2006) (citing <u>United States v. Bustillos-Munoz</u>, 235 F.3d 505, 515 (10th Cir. 2000).

---

[9]Carr testified that he has investigated approximately 63 DUIs 25 accidents, and 15 cases of transporting an open container where he initially stopped the vehicle for lane violations.

Defendant argues that his consent was not voluntary because he had been sitting in Carr's patrol car for approximately 30 minutes just prior to giving his consent to search.  Additionally, defendant claims that Carr's size and physical characteristics are intimidating, and he was not told that he could refuse giving consent or withdraw consent at any time.  The Tenth Circuit has held, however, that sitting inside a "patrol car, without more, does not make [defendant's] consent involuntary." Bradford, 423 F.3d at 1158; United States v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997) (finding an encounter to be consensual, despite the fact that the officer and the defendant were both sitting in the patrol car during the questioning, because a reasonable person would have felt free to terminate the encounter).

Carr returned defendant's driver's license and handed defendant the warning.  Defendant shook Carr's hand, opened the door, and was beginning to get out of the patrol car, all of which indicate that he felt free to leave at that point.  Carr then instigated additional questioning.  Carr first asked defendant if he could ask him some more questions.  Defendant consented and voluntarily sat back down in the passenger seat.  Carr asked defendant if he was carrying anything illegal and further asked if he could check.  Defendant denied carrying anything illegal and consented to Carr's search.

Carr was the only law enforcement officer present at this time. He did not display his gun or make any threats.  The court finds that Carr is not that much bigger than defendant.  Furthermore, the Fourth Amendment does not require that defendant be told that he is free to

leave, may decline giving consent, or may withdraw consent at any time. Bradford, 423 F.3d at 1158. Defendant agreed to let Carr search the Volkswagen and the court finds that defendant's consent was voluntary. Therefore, defendant's Fourth Amendment right against unreasonable searches was not violated.

## III.   CONCLUSION

As a result of the above analysis, the court finds there was no Fourth Amendment violation. There was a lawful initial stop followed by a reasonable detention and consensual search. The cocaine found during the search is not required to be suppressed as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 484 (1963) (requiring exclusion of evidence obtained through an illegal search).

Defendant's motion to suppress (Doc. 20) is DENIED. The clerk is directed to set this case for trial.

IT IS SO ORDERED.

Dated this  15th  day of May 2009, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE